JUDICIAL WATCH, INC., Plaintiff,

v.

UNITED STATES POSTAL
SERVICE, Defendant.

No. CIV.A.02–01101(HHK).

United States District Court,
District of Columbia.

Jan. 21, 2004.

Larry Klayman, Paul J. Orfanedes, James F. Peterson, Judicial Watch, Inc., Washington, DC, for Plaintiff.

Tamara Lynn Ulrich, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

KENNEDY, District Judge.

Plaintiff, Judicial Watch, Inc. ("Judicial Watch"), brings this action against defen-

dant, United States Postal Service ("USPS"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiff seeks access to various records related to defendant's decisions regarding the discovery of anthrax at USPS facilities in October 2001. In response, defendant seeks to withhold and redact certain documents by invoking certain privileges under FOIA Exemption 5, 5 U.S.C. § 552(b)(5).

Before this court are the parties' cross-motions for summary judgment. Upon consideration of the motions, the respective oppositions thereto, and the record of this case, the court concludes that defendant's motion for summary judgment must be granted in part and denied in part without prejudice, and that plaintiff's cross-motion must be denied without prejudice.

## I. BACKGROUND

On October 25, 2001, Judicial Watch, pursuant to FOIA, requested that USPS provide certain records relating to the discovery of anthrax at U.S. Postal Service facilities. In particular, Judicial Watch requested access to

all correspondence, memoranda, documents, reports, records, statements, audits, lists of names, applications, diskettes, letters, expense logs and receipts, calendar or diary logs, facsimile logs, telephone records, call sheets, tape records, video recordings, notes, examinations, opinions, folders, files, books, manuals, pamphlets, forms, drawings, charts, photographs, electronic mail, and other documents and things that refer or relate to the following in any way:

1. The process for identification of postal workers infected and/or exposed to anthrax.

2. The decision to conduct tests at the Brentwood USPS facility.

3. The decision to quarantine portions of the Brentwood USPS facility.

4. The decision to test other USPS facilities for anthrax contamination.

5. The decision to suspend mail delivery to zip codes 20007, 20005, 20004.

6. The decision to keep the Brentwood USPS facility open.

7. The decision to test Brentwood USPS facility employees for anthrax.

.... The time frame for this request is from September 11, 2001 to the present.

Pl.'s Ex. 1 at 1–2 (Judicial Watch Ltr. to Post Master, Oct. 25, 2001) ("October Letter"). Perhaps ironically, USPS claimed not to have received the October Letter because of mail service disruptions caused by the anthrax scare and the need to sanitize (irradiate) mail. In December 2001, having received no response, Judicial Watch faxed USPS a copy of the October Letter. In January 2002, USPS replied to the October Letter and attempted to identify the documents responsive to Judicial Watch's seven requests. *See* Pl.'s Ex. 2 at 1–2 (Faruq Ltr. to Calabrese, Jan. 22, 2002) ("USPS Letter"). USPS's response letter indicated that Judicial Watch could appeal to USPS's General Counsel if it construed the USPS response to be a denial of the FOIA requests in the October Letter. *Id.* at 2. In February 2002, Judicial Watch appealed to USPS's General Counsel. On June 6, 2002, after receiving no response from USPS's General Counsel, Judicial Watch filed the present action.

In October 2002, USPS released to Judicial Watch 1,228 pages in their entirety and 124 redacted pages related to the October 2001 anthrax contamination. In addition to redacting 124 pages, USPS withheld 401 otherwise relevant pages pursuant to various FOIA exemptions. The present action concerns only 15

pages redacted and 399 pages withheld pursuant to FOIA Exemption 5.[1]

## II. ANALYSIS

### A. Legal Standard

Under Fed.R.Civ.P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 In FOIA cases, agency decisions to withhold or disclose information under FOIA are reviewed *de novo* by this court. *Mead Data Cent., Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 251 (D.C.Cir.1977) (finding that the district court "decides a claim of exemption de novo"). FOIA places "the burden ... on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B). The agency may meet this burden by submitting affidavits or declarations that describe the withheld material in reasonable detail and explain why it falls within the claimed FOIA exemptions. *Summers v. Dep't of Justice,* 140 F.3d 1077, 1080 (D.C.Cir.1998). The court should grant a FOIA requester's motion for summary judgment "[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption ...." *Petroleum Info. Corp. v. U.S. Dep't of Interior,* 976 F.2d 1429, 1433 (D.C.Cir.1992). Conversely, the agency affidavits "cannot support summary judgment if they are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *King v. U.S. Dep't of Justice,* 830 F.2d 210, 219 (D.C.Cir.1987) (internal quotations omitted). Finally, an agency's judgment regarding the applicability of a FOIA exemption is accorded no particular deference. *Mead Data Cent.,* 566 F.2d at 251 ("[T]he agency's opinions carry no more weight than those of any other litigant in an adversarial contests before a court.").

### B. FOIA Background

Congress enacted FOIA "to open up the workings of government to public scrutiny through the disclosure of government records." *Stern v. FBI,* 737 F.2d 84, 88 (D.C.Cir.1984) (internal quotations omitted). FOIA was intended to " 'ensure an informed citizenry, vital to the functioning of a democratic society.' " *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 872 (D.C.Cir.1992) (quoting *FBI v. Abramson,* 456 U.S. 615, 621, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982)). In so doing, however, Congress acknowledged that "legitimate governmental and private interests could be harmed by release of certain types of information." *Id.* In order to balance these competing interests, FOIA contains nine exemptions under which an agency may withhold information. 5 U.S.C. § 552(a)(4)(B) & (b)(1)-(9). Because FOIA creates a policy favoring disclosure, however, the Act's exemptions are to be narrowly construed. *Dep't of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976).

 When an agency refuses to disclose certain documents pursuant to a FOIA exemption, it must ordinarily produce a

---

1. USPS also invoked Exemptions 2, 3, 6 and 7(c) to redact 112 pages and withhold 2 pages of documents, but Judicial Watch has conceded the proper application of those exemptions. Pl.'s Cross–Mot. for Summ. J. at 2. The court therefore grants summary judgment in favor of USPS with regard to these documents.

"*Vaughn* Index," a description of each document withheld or redacted and an explanation of the reasons for non-disclosure. *See Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C.Cir.1973) ("Vaughn I") (creating a "system of itemizing and indexing" that requires agencies invoking FOIA exemptions to "correlate statements made in the . . . refusal justification with the actual portions of the document"). The *Vaughn* Index must permit a reviewing court to engage in a meaningful review of the agency's decision. *See Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C.Cir.1996). Because the applicability of the deliberative process privilege is dependent on the content of each document and the role it plays in the decisionmaking process, an agency's affidavit describing the withheld documents must be specific enough so that the elements of the privilege can be identified. *Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C.Cir. 1987); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980); *Mead Data Cent., Inc.*, 566 F.2d at 251.

██ An agency's failure to provide a *Vaughn* Index is not, by itself, reason to reject a claim of exemption. *See Gallant v. NLRB*, 26 F.3d 168, 173 (D.C.Cir.1994) (holding that "production of a Vaughn Index was not necessary given the adequacy of the government's affidavits."). An agency may submit materials in " 'any form,' " including an affidavit or oral testimony, " 'so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege.' " *Id.* (citing *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 128 (D.C.Cir.1987)). Indeed, an agency need not provide document-by-document information *if* what it provides is " 'sufficiently distinct to allow a court to determine . . . whether the specific claimed exemptions are properly applied.' " *Id.* (citing *Vaughn v. United States*, 936

F.2d 862, 868 (6th Cir.1991)). Essentially, an agency must "disclos[e] as much information as possible without thwarting the exemption's purpose." *King*, 830 F.2d at 224.

██ However, as a purely practical matter, document-by-document justification will usually be necessary. This is because, in addition to distinguishing exempt from non-exempt documents, an agency must perform a "segregability analysis": It must also distinguish exempt from non-exempt material *within* each document. *See Vaughn I*, 484 F.2d at 825 ("[A]n entire document is not exempt merely because an isolated portion need not be disclosed. Thus the agency may not sweep a document under a general allegation of exemption, even if that general allegation is correct with regard to part of the information."). An agency must attempt to redact exempt information and produce any relevant non-exempt information. *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."). If an agency that can show that certain material in a document is privileged, but cannot be reasonably segregated from non-exempt information, that agency must also "describe what proportion of the information is non-exempt and how that material is disbursed throughout the document," such that "both litigants and judges will be better positions to test the validity of the agency's claim that the non-exempt material is not segregable." *Mead Data Cent.*, 566 F.2d at 261.

## C. Exemption 5

The only exemption at issue in this case is 5 U.S.C. § 552(b)(5) ("Exemption 5"). Judicial Watch contests USPS's use of Ex-

emption 5 to redact 15 pages and withhold 399 pages.

Under Exemption 5, an agency may withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency." *Id.* Under the umbrella of Exemption 5, USPS invokes three different privileges: (1) the deliberative process privilege, (2) the attorney-client privilege, and (3) the attorney work-product privilege. The court analyzes the sufficiency of USPS's affidavit[2] to support these privilege claims, *see generally* Benowitz Supp. Decl., and analyzes each privilege in turn.

### 1. Deliberative Process Privilege

USPS invokes the deliberative process privilege in redacting seven pages[3] (of 15 pages redacted under Exemption 5) and in withholding 398 pages[4] (of 399 pages withheld under Exemption 5).

Exemption 5 protects from disclosure any documents that reveal an agency's deliberative process in reaching policy decisions. *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *Jordan v. U.S. Dep't of Justice,* 591 F.2d 753, 775 (D.C.Cir.1978) (en banc) (finding that documents reflecting an "agency's group thinking in the process of working out its policy and determining what its law shall be" are exempt under FOIA Exemption 5) (internal quotations omitted). The privilege's rationale is that advice and information would not flow freely within an agency if such consultative information were open to public scrutiny. *Mead Data Cent.,* 566 F.2d at 256; *Schell v. U.S. Dept. of HHS,* 843 F.2d 933, 942 (6th Cir.1988) ("It is the free flow of advice ... that exemption 5 seeks to protect."). The privilege recognizes that " 'those who expect public dissemination of their remarks may well temper candor with a concern for appearances ... to the detriment of the decisionmaking process.' " *Sears, Roebuck & Co.,* 421 U.S. at 150–51, 95 S.Ct. 1504 (quoting *United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). Exemption 5 thus allows agency staffers to provide decisionmakers with candid advice without fear of public scrutiny. The deliberative process privilege advances other salutary interests as well. It helps to prevent premature

---

2. The court refers exclusively to the Mitchell J. Benowitz Supplemental Declaration ("Benowitz Supp. Decl."), which is simply an elaboration on the Exemption 5 coverage in the original Benowitz Declaration. *Compare generally* Benowitz Supp. Decl. *with* Benowitz Decl. ¶¶ 33, 37. Furthermore, all page citations (e.g., "Pages 197–99") refer to "the Bates page numbers stamped on the records located in response to Plaintiff's Freedom of Information Act request." Benowitz Supp. Decl. ¶ 3.

3. Three pages were redacted exclusively under the deliberative process privilege. *See* Benowitz Supp. Decl. ¶ 35–38 (Pages 1341, 1426, 1734). Four more pages were redacted under the deliberative process privilege in addition to the attorney-client or attorney work-product privileges. *See id.* ¶ 34 (Pages 204–05, 208–09).

4. Of the 398 pages, 386 pages were withheld solely under the deliberative process privilege. *See id.* ¶¶ 5–7 (withholding Pages 94–103, 251–52), 8–13 (withholding Pages 104–80, 212–28, 247–50, 253–64, 278–89, 345–91, 1266–69, 1748–1766), 14–19 (withholding Pages 454–508), 15 (withholding Pages 576, 825–29, 1298–1314, 1316–20), 20–24 (withholding Pages 1282–84, 1332, 1496–98, 1538–40, 1545, 1549–50, 1593, 1604–05), 25 (withholding Pages 1324–29, 1353–55, 1371–72, 1438–53, 1506–10, 1524, 1580–84, 1588–89, 1607, 1631–37, 1641–42, 1664–75, 1677–90, 1700–06). The other 12 pages are withheld under the deliberative process privilege in addition to the attorney-client or attorney work-product privileges. *See id.* ¶¶ 27–29, (withholding pages 981–82, 1187–91, 1192–94), 31 (withholding Pages 1746–47).

disclosure of proposed policies and protects against public confusion through the disclosure of documents suggesting reasons for policy decisions that were ultimately not taken. *See Am. Petroleum Inst. v. U.S. EPA,* 846 F.Supp. 83, 88 (D.D.C.1994). In sum, the privilege is designed to "prevent injury to the quality of agency decisionmaking." *Sears, Roebuck & Co.,* 421 U.S. at 151, 95 S.Ct. 1504.

■ To invoke the deliberative process privilege, an agency must show that an allegedly exempt document is both "predecisional" and "deliberative." *Access Reports v. Dep't of Justice,* 926 F.2d 1192, 1194 (D.C.Cir.1991); *Coastal States,* 617 F.2d at 866; *Animal Legal Def. Fund, Inc. v. U.S. Dep't of Air Force,* 44 F.Supp.2d 295, 299 (D.D.C.1999). First, a "predecisional" document is one that is "antecedent to the adoption of agency policy." *Jordan,* 591 F.2d at 774. Beyond this, an agency must also either " 'pinpoint an agency decision or policy to which the document contributed,' " *Am. Petroleum Inst.,* 846 F.Supp. at 88 (quoting *Senate of Puerto Rico,* 823 F.2d at 585); *accord Hinckley v. United States,* 140 F.3d 277, 284 (D.C.Cir.1998), or identify a decisionmaking process to which a document contributed. *See Access Reports,* 926 F.2d at 1196 (finding that an agency need not identify "a single, discrete decision," since not all processes result in final agency decisions, but must at least identify a specific decisionmaking process).

Second, a "deliberative" document is one that is "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen,* 523 F.2d 1136, 1143–44 (D.C.Cir.1975) ("Vaughn II"). It must reflect the "give-and-take of the consultative process." *Senate of Puerto Rico,* 823 F.2d at 585; *see EPA v. Mink,* 410 U.S. 73, 88, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Merely factual material is not exempt; the document must "bear on the formulation or exercise of agency policy-oriented *judgment.*" *Petroleum Info. Corp.,* 976 F.2d at 1435 (emphasis in original). Thus, deliberative documents are those "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sears, Roebuck & Co.,* 421 U.S. at 150, 95 S.Ct. 1504. The deliberative process privilege exists to prevent injury to agency decisionmaking. *Id.* at 151, 95 S.Ct. 1504. However, such harm can not be merely presumed as USPS suggests.[5] *Mead Data Cent.,* 566 F.2d at 258 ("An agency cannot meet its statutory burden of justification by conclusory allegations of possible harm."). The agency must identify the role of a contested document in a specific deliberative process, *Coastal States,* 617 F.2d at 868, in order to "show by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA." *Mead Data Cent.,* 566 F.2d at 258; *see also King,* 830 F.2d at 224 (finding, in an Exemption 1 case, that a *Vaughn* Index "must discuss the consequences of disclosing the sought-after information"); *Formaldehyde Inst. v. Dep't of Health & Human Serv.,* 889 F.2d 1118, 1123–24 (D.C.Cir.1989) ("The pertinent issue is what harm, if any, the [document's] release would do to [an agency's] deliberative process.").

Since the applicability of the deliberative process privilege depends on the content of each document and the role it plays in

---

5. *See* Def.'s Reply at 9 ("[P]laintiff has not *rebutted the presumption* that documents such as these [inter-agency memoranda] are protected under the deliberative process privilege.") (emphasis added).

the decisionmaking process, an agency's affidavit must correlate facts in or about each withheld document with the elements of the privilege. *See Senate of Puerto Rico*, 823 F.2d at 585; *Coastal States*, 617 F.2d at 866; *Mead Data Cent.*, 566 F.2d at 251. Without a sufficiently specific affidavit or *Vaughn* Index, a court cannot decide, one way or the other, a deliberative process privilege claim. *Senate of Puerto Rico*, 823 F.2d at 585 (finding that in the absence of "any identification of the specific final decisions to which ... advice or recommendations contained in the withheld documents contributed," a court is "not positioned to pass upon the applicability ... of this privilege"); *see also King*, 830 F.2d at 223, 225 (declining, in an Exemption 1 case, to express a view on the validity of a *Vaughn* Index which "provide[d] an insufficient basis for the de novo review that FOIA mandates").

■ In this case, USPS invokes the deliberative process privilege for six different categories of documents: (1) drafts of anthrax sampling procedures, (2) draft chronologies, (3) materials prepared for congressional testimony, (4) meeting notes, (5) employee correspondences and memoranda,[6] and (6) draft informational documents. With regard to each document in each category, USPS's affidavit is insufficient to decide the claims of privilege on summary judgment either in favor of USPS or Judicial Watch. The court analyzes each category in turn.

a. *Draft Procedures for Anthrax Sampling.*

USPS withholds 12 pages of documents pursuant to the deliberative process privi-

lege because they are "drafts of procedures related to environmental sampling of anthrax." Benowitz Supp. Decl. ¶ 5. USPS provides other details that simply document the fact that the pages are drafts. *Id.* ¶¶ 6 ("The document is designated as a draft, and it may have been revised prior to the issuance of a final version. Therefore, the document reflects the process through which a final version of the procedures may have been developed ...."), 7 (noting that Pages 251–52 were "designated as a draft" and also were "subject to revision" and contained handwritten corrections). Only the titles provided by USPS hint at the *specific* content of these documents. *See id.* ¶ 6 (identifying Pages 94–103 as draft of document sent to the Center for Disease Control entitled "Procedures for Collecting Environmental Samples of Anthrax"), 7 (noting Pages 251–52 as draft of document entitled "USPS Sampling Strategy: A Chronology.").

These descriptions are inadequate to prove the elements of the deliberative process privilege. First, it is unclear if the drafts are predecisional. The most basic requirement of the privilege is that a document be *antecedent* to the adoption of an agency policy. *See Jordan*, 591 F.2d at 774. A post-decisional document, draft or no, by definition cannot be "predecisional." *See Petroleum Info. Corp.*, 976 F.2d at 1434 ("A document is predecisional if it was prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made.") (internal quotations and citations omitted). USPS's affidavit does not indi-

---

**6.** USPS identified seven categories. However, for purposes of the deliberative process privilege, the court analyzes correspondences between USPS attorneys and USPS employees in the same category as general correspondences written by employees. USPS also invokes the attorney-client or attorney work-product privileges with regard to USPS attorney-employee correspondences. They are, as a result, analyzed below in light of these privileges.

cate whether the 12 pages preceded USPS's final adoption of anthrax-testing procedures, and therefore may have influenced policy, or whether these documents merely described USPS's anthrax sampling procedures after the fact, and therefore are not protected.

■ Second, even had USPS shown the documents to be predecisional, drafts are not presumptively privileged. *See Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C.Cir.1982) ("The designation of ... documents ... as 'drafts' does not end the inquiry, however. *Coastal States* forecloses the ... argument that any document identified as a draft is per se exempt."); *Mead Data Cent.*, 566 F.2d at 257 ("Predecisional materials are not exempt merely because they are predecisional."). USPS failed to identify the "function and significance ... in the agency's decision-making process" of the redacted and withheld documents. *Arthur Andersen*, 679 F.2d at 258 (internal quotation marks and citations omitted). Without specific information, the court cannot determine on its own whether these documents are deliberative.

Finally, USPS failed to indicate whether these drafts were (1) "adopted formally or informally, as the agency position on an issue;" or (2) "used by the agency in its dealings with the public." *See id.* at 257–58 (internal quotation omitted). Either will defeat a claim of privilege, for both actions involve the exposure of the withheld documents to third parties.

These ambiguities, with regard to each element of the deliberative process privilege, prevent the court from granting summary judgment in favor of USPS. These ambiguities, at the same time, do not foreclose the possibility that USPS has properly withheld the documents. Therefore the

court must deny summary judgment to both USPS and Judicial Watch.

*b. Chronologies, Timeliness, and Summaries*

USPS withheld or redacted nearly 200 pages of draft chronologies, timelines or summaries related to the discovery of anthrax in 2001. *See* Benowitz Supp. Decl. ¶¶ 8–13 (noting that 192 documents were withheld because they were drafts of chronologies, timelines or summaries of events related to the discovery of anthrax), 31 (noting that two pages were withheld as a chronology of events drafted by USPS attorneys),[7] 34 (noting that USPS redacted Pages 204, 205, 208, and 209 because they are parts of a draft chronology). Some of these documents were comments, opinions, and recommendations about the chronologies. *Id.* ¶¶ 8, 10–13.

For some of the reasons previously expressed with regard to the descriptions of the draft anthrax procedure documents, USPS's affidavit is inadequate with regard to the draft chronologies. It does not specify whether these draft chronologies were antecedent to final policies, and therefore are predecisional; whether the drafts were adopted as final policy (and therefore are no longer predecisional); and whether the agency has not already used the documents in communications with the public.

However, USPS's affidavit raises other material ambiguities unique to the chronologies. Generally, factual accounts of events do not fall under Exemption 5. *See Petroleum Info. Corp.*, 976 F.2d at 1434 (finding that "[u]nder the deliberative process privilege, factual information generally must be disclosed"); *Mead Data Cent.*, 566 F.2d at 256 ("Many exemption five disputes may be able to be decided by

---

**7.** These two pages are also analyzed under the attorney work-product privilege.

application of the simple test that factual material must be disclosed but advisory material ... may be withheld."). However, some documents may arrange or deal with facts in such a way that they reveal the policy judgments of the author and thus an agency's deliberative process. *See id.* ("In some circumstances, however, the disclosure of even purely factual material may so expose the deliberative process within an agency that it must be deemed exempted ...."). As a result, a court should "shelter factual summaries that were written to assist the making of a discretionary decision." *See Mapother v. Dep't of Justice,* 3 F.3d 1533, 1539 (D.C.Cir.1993). Exempt factual materials include, for instance, those that involve the "interpretation of complex and controversial events critical to the writing of official histories," *Petroleum Info. Corp.,* 976 F.2d at 1437 (internal citations and quotations omitted), or documents "in which an agency has winnowed a mass of information into a small set of facts which, if revealed, would unveil the agency's reasoning by showing what it considered relevant (and irrelevant)." *Id.* at 1438.

Specific to these documents, the D.C. Circuit found that agencies must disclose purely factual chronologies. *See Mapother,* 3 F.3d at 1539–40. That court required the Immigration and Naturalization Service ("INS") to produce a chronology of the Nazi military service history of former Austrian President Kurt Waldheim because, unlike the rest of the INS report on Waldheim, the chronology "reflect[ed] no point of view," was "organized strictly chronologically, not thematically" and "in no way betray[ed] the occasion that gave rise to its compilation." *Id.* at 1540.

The *Mapother* court had enough information to decide a summary judgment mo-

tion. *See id.* at 1539–40 (examining the Waldheim chronology *in camera* and finding them reasonably segregable and subject to disclosure). This court does not. The following is all of USPS's description of 172 pages of withheld chronologies, timelines, etc.:

> [The pages] all consist of chronologies of events related to the discovery of anthrax in the mail that are designated as drafts. These drafts were created by and/or circulated among various Postal Service offices for the purpose of inputting, updated, and correcting information contained in the draft chronologies. Some of the draft chronologies contain handwritten corrections to the typed text. Therefore the documents reflect the preliminary views of the authors that may have been altered or rejected, and they also reflect editorial judgments. These pages are being withheld pursuant to the deliberative process privilege. A final version of the chronology has been released to Plaintiff.

Benowitz Supp. Decl. ¶ 9. USPS is similarly vague in describing the other chronologies, though a bit longer, are similarly vague. *Id.* ¶¶ 12–13, 31, 34.

It is entirely unclear, from USPS's declaration, if the draft chronologies simply list facts and involve no judgment, as in *Mapother,* or if they involve the sort of fact-winnowing-sifting wheat from chaff-that required the judgment of agency employees. Furthermore, USPS's descriptions say nothing about purpose of the draft chronologies.[8] The court simply lacks the specific information it needs to decide, de novo and on summary judgment, whether these documents are "deliberative." Such ambiguities require the

---

8. USPS indicates that Judicial Watch possesses the final version of the chronology, *id.* ¶ 9, without actually identifying the Bates page numbers of the final chronologies. *See id.*

court to deny summary judgment to both USPS and Judicial Watch.

USPS also invokes the privilege with regard to 5 other pages of opinions and comments about the chronologies and their creation, as well as revisions made by employees. *See id.* ¶¶ 10–11. The court must also deny summary judgment to both parties with regard to these documents. These 5 pages seem "deliberative" because they involve a "give-and-take" between employees. *See Senate of Puerto Rico,* 823 F.2d at 585. However, the give-and-take must regard "opinions on legal or policy matters." *Vaughn II,* 523 F.2d at 1143–44. If the chronologies themselves merely restate facts, and do not involve "legal or policy matters," any comments or opinions about these same chronologies are not privileged. However, because the USPS affidavit does not clearly identify the chronologies themselves as factual or policy-oriented, the court cannot determine whether the opinions and comments regarding the chronologies are privileged.

### c. *Materials for Congressional Testimony*

USPS withheld 55 pages because they were prepared for the congressional testimony of USPS officials. Benowitz Supp. Decl. ¶ 14. USPS's describes the documents as follows: "These documents contain information compiled specifically to assist the officials in testifying at hearings, sample questions and answers, and key points of focus for anticipated testimony." *Id.* This passage is as ambiguous as the descriptions of the draft chronologies. First, USPS has not shown, one way or the other, that the prepared testimony was "antecedent" to USPS policy. If the testimony simply justified or explained USPS reactions to the anthrax outbreak to Congress, the materials are not antecedent and therefore are not protected. *See Pe-*

*troleum Info. Corp.,* 976 F.2d at 1434. But USPS does not describe the purpose or nature of the congressional inquiry or the content of USPS's prepared testimony materials; therefore, the court cannot conclude that the materials were or were not antecedent and cannot grant summary judgment in favor of either party.

Secondly, even if the testimony were "antecedent" to policy, USPS does not indicate one way or the other whether the compilation of information itself was deliberative. On one hand, USPS officials merely "compiled" information, which seems to involve little or no judgment at all. *See Petroleum Info. Corp.,* 976 F.2d at 1435. On the other hand, providing "key points of focus" suggests discretionary "fact-winnowing" that is, therefore, deliberative. *Id.* at 1438.

Finally, USPS fails to identify what, if any, of the prepared testimony actually was read by USPS employees in public or appeared in published records. USPS must waive the privilege with regard to the materials it made available to other parties, whether by reading or publishing them. *See Arthur Andersen,* 679 F.2d at 257–58 (requiring disclosure of predecisional documents "used by the agency in its dealings with the public"). In sum, these ambiguities require the denial of summary judgment as to both parties.

### d. *Meeting Notes*

USPS withheld 28 pages of documents which it categorizes as "consist[ing] of notes of meetings or discussions during which postal employees and employees of other federal agencies discussed, recommended, or proposed ways of responding to the discovery of anthrax in the mail." *See* Benowitz Supp. Decl. ¶ 15. USPS purports to provide more specific details about each document. *Id.* ¶¶ 16–19. One page "lists the names of several Postal

Service officials, and contains notes of proposed actions in response to the discovery of anthrax in the mail." *Id.* ¶ 19. Two pages are "primarily related to environmental testing and safety measures" and "are in the form of questions or are followed by question marks." *Id.* ¶ 17. Seventeen pages are "to do" lists that "contain entries related to actions taken or proposed in response to the discovery of anthrax in the mail" and again, some "entries are followed by question marks." *Id.* ¶ 18. Finally, three pages "appear[ ] to be notes of a meeting between CDC and Postal Service officials to discuss how to respond to the discovery of anthrax in the mail." *Id.* ¶ 19.

These descriptions do not indicate whether or not the documents are both predecisional and deliberative. First, USPS does not identify *specific* final decisions or decisionmaking processes to which the documents contributed. It is not enough to say that the documents relate, in some way, to "actions taken or proposed in response to the discovery of anthrax in the mail," *id.* ¶ 18, for if they did not, the documents would not be before the court at all. USPS must identify particular decisionmaking processes, or else the court cannot recognize the documents as "predecisional." *See Am. Petroleum Inst.*, 846 F.Supp. at 88. However, the same vague descriptions leave open the possibility that these documents *did* contribute to particular decisionmaking processes. Second, USPS fails to specify the "deliberativeness" of these documents. The descrip-

tions indicate generally that the meeting notes record the policy proposals of various USPS employees. But USPS does not, as it must, identify the specific harms that would result from the disclosure of these proposals. *Mead Data Cent.*, 566 F.2d at 258. Finally, USPS does not indicate whether or not any of the proposals recorded in the meeting notes were ultimately adopted as policy; those adopted as policy must be disclosed. *See Arthur Andersen*, 679 F.2d at 258 (subjecting to disclosure documents "adopted formally or informally, as the agency position on an issue").

### e. *Employee Correspondences and Memoranda*

USPS withheld 26 pages and redacted 7 pages [9] involving correspondences or memoranda, notable mainly because they were written by employees.

As a general matter, employee-to-supervisor correspondences (all e-mails, in this case) are more likely than other intra-agency communications to be protected under the deliberative process privilege. *See Access Reports*, 926 F.2d at 1195 ("A document from a junior to a senior is likely to reflect his or her own subjective opinions . . . . By contrast, one moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give and take.") (citing *Senate of Puerto Rico*, 823 F.2d at 586; *Coastal States*, 617 F.2d at 868). USPS fails to identify the recipients of the

---

9. USPS withheld 16 pages (Pages 1282–84, 1332, 1496–98, 1538–40, 1545, 1549–50, 1593, 1604–05), Benowitz Supp. Decl. ¶¶ 20–24, and redacted three pages (Pages 1341, 1426 and 1734), *id.* ¶¶ 35–38, of correspondences and memoranda by USPS employees regarding the anthrax contamination and USPS's response. These documents are only considered under the deliberative process

privilege. USPS further withheld 10 pages, *id.* ¶¶ 27–29 (Pages 981–82, 1187–94), and redacted four pages of various communications between USPS attorneys and other USPS employees. *Id.* ¶ 34 (Pages 204, 205, 208, 209). These documents are also analyzed under the attorney-client and attorney work-product privileges below.

non-legal correspondences. *See* Benowitz Supp. Decl. ¶¶ 21–24. It is not possible to tell whether these e-mails were from junior employees to supervisors and, therefore, part of a deliberative "give and take"; this would have made it easier to determine whether these documents were "deliberative."

More problematic, however, is that USPS's affidavit mostly fails to identify particular decisionmaking processes or final policies to which the employee e-mails contributed. For instance, USPS indicates that employees identified "priorities for incidents related to anthrax in the mails [sic]," Benowitz Supp. Decl. ¶ 21, and "generally describe[d] the issues" to be discussed at employee meetings. *Id.* ¶ 22. In two instances, USPS identifies specific deliberative process or policy. *Id.* ¶¶ 23 (explaining that in one document, employees "made a recommendation regarding a particular method of testing for anthrax spores."), 36 (indicating that an e-mail message addressed an employees opinion on "how to responded to requests for information about the test results" of a USPS facility). However, USPS does not identify the specific harm in disclosing any these documents, reiterating only that each "reflects the predecisional thoughts, judgments, and recommendations" of USPS employees. *See id.* ¶¶ 21–24 (using the same language for each set of employee e-mails); 36–38 (using similarly conclusory language). Though even a conclusory allegation of harm would be insufficient, *Mead Data Cent.*, 566 F.2d at 258 (finding that agencies cannot justify withholding documents by "conclusory allegations of possible harm"), USPS fails to allege any harm at all.

USPS's descriptions of the legal correspondences (analyzed again under the attorney-client or the attorney work-product privileges) also fail to provide enough information for a proper de novo review. Two documents involve legal advice on specific situations from USPS attorneys to USPS managers. *See* Benowitz Supp. Decl. ¶¶ 27, 29. These descriptions are *almost* detailed enough to be privileged. They are predecisional in that they are antecedent to policy-the documents are from employees (attorneys) to managers. *See id.* Furthermore, USPS identifies specific decisionmaking processes-what USPS should do about media requests for access to USPS facilities, *id.* ¶ 27, and what to do about potential USPS employee lawsuits to close USPS facilities. *Id.* ¶ 29. In addition, these documents are deliberative to the extent that they provide advice on matters of agency policy; they bear on the exercise of agency policy judgments. *See Petroleum Info. Corp.*, 976 F.2d at 1435. USPS fails, however, to identify the specific harm of releasing these documents. *Mead Data Cent.*, 566 F.2d at 258. Furthermore, USPS does not indicate, as it must, that these documents have not been adopted as final agency policy and that they have not been given, in some way, to the public (i.e., communicating policy positions in these documents to the media requesting access or submitting legal positions in these documents in the course of public litigation with USPS employees). *See Arthur Andersen,* 679 F.2d at 258. The court must therefore deny summary judgment to both parties with regard to these documents.

With regard to all other legal correspondences, USPS has not provided enough specific information. USPS withheld one other document, "draft talking points" from a USPS official to USPS attorney. Benowitz Supp. Decl. ¶ 28. USPS identifies nothing more specific about the content of this document, does not specify its place in a particular decisionmaking context, and does not indicate whether, as a draft, these talking points were actually

used in a communication with the public. *See id.* USPS also redacted four pages of a chronology summarizing legal correspondences by USPS attorneys. *See id.* ¶ 34 (Pages 204, 205, 208, 209). While some descriptions involve "legal advice" or "messages between managers," USPS identifies nothing more specific about any of these pages, nothing about the general purpose of the legal advice, whether or not USPS ultimately adopted this advice as policy, and what of these correspondences were already shared with the public via any actual litigation. *Id.* Because these descriptions are insufficient to conduct a de novo review, the court must deny summary judgment to both USPS and Judicial Watch.

### f. Informational Documents and Comments

USPS withholds 83 pages of what it characterizes as informational documents or comments on them by USPS employees: "drafts of news releases, published guidance of postal employees, and similar informational documents" as well as "postal employees' comments, suggestions, and recommendations concerning such drafts." Benowitz. Supp. Decl. ¶ 25. After explaining the general category of documents withheld, the affidavit provides slightly more detail about the documents-fifteen individual descriptions. Even the most comprehensive of these descriptions falls short of helping this court determine whether or not the documents are privileged: "Pages 1677–87 consists of draft versions of an emergency action plan memo, and e-mail containing the comments and suggestions of Postal Service employ-

ees regarding the draft versions." *Id.* ¶ 25(a). This is the most elaborate description of any of the 83 pages and still fails to pinpoint particular decisionmaking processes or policies these documents contributed to. More often, these descriptions provide less information and simply indicate that the documents are drafts. *See, e.g., id.* ¶¶ 25(f), (i) (identifying withheld Pages 1452–53 as "a draft briefing sheet" and Pages 1588–89 as "a draft press release"). The court cannot identify specific details that allow it to conclude, one way or the other, whether or not these documents are predecisional and deliberative. Furthermore, as with every other document it identifies as a draft, USPS fails to indicate whether these documents were adopted as final policies or previously disclosed to third parties, *see Arthur Andersen,* 679 F.2d at 258.

In sum, the general insufficiency of USPS's declarations with regard to each category of documents compels the court to deny USPS's and Judicial Watch's cross-motions for summary judgment with regard to all documents withheld or redacted pursuant to the deliberative process privilege. Without more information, this court can not conduct the required de novo review of the validity of USPS's withholdings and redactions. *See Mead Data Cent.,* 566 F.2d at 251.

### 2. Attorney–Client Privilege

USPS invokes the attorney-client privilege in redacting nine pages [10] (of 15 pages redacted in total) and in withholding eight pages [11] (of 399 pages withheld in total).

---

**10.** Two pages were redacted solely under the attorney-client privilege. *See* Benowitz Supp. Decl. ¶ 34 (referring to redacted Pages 191 and 207). Seven more pages were redacted under the attorney-client privilege in addition to the deliberative process or attorney work-

product privileges. *See id.* ¶ 34 (referring to redacted Pages 197, 200–04, 208).

**11.** Only one pages was withheld solely under the attorney-client privilege. *See id.* ¶ 30 (referring to withheld Page 1591). The re-

The attorney-client privilege exists to protect a client's confidences to her attorney so that the client may have "uninhibited confidence" in the inviolability of her relationship with her attorney. *Coastal States*, 617 F.2d at 862. The privilege also protects communications by the attorney to her client regarding the same issues. *Id.* To invoke the privilege, an agency must demonstrate that the document it seeks to withhold (1) involves "confidential communications between an attorney and his client" and (2) relates to "a legal matter for which the client has sought professional advice." *Mead Data Cent.*, 566 F.2d at 252; *see also Animal Legal Def. Fund*, 44 F.Supp.2d at 302. The privilege does not allow an agency to withhold a document merely because it is a communication between the agency and its lawyers. *Coastal States*, 617 F.2d at 862–63. The agency bears the burden of showing that the information exchanged was confidential. *Mead Data Cent.*, 566 F.2d at 253. That is, the agency must show that it supplied information to its lawyers "with the expectation of secrecy and was not known by or disclosed to any third party." *See id.* at 254.

USPS describes two pages in *almost* enough detail to invoke the privilege, but ultimately not enough detail to allow the court to grant summary judgment in its favor. Pages 981–82 are emails from a USPS attorney to USPS managers, with the heading "Privileged Information–Attorney/Client Communication" and containing "legal advice regarding how to respond to requests from the news media for access to Postal Service facilities." Benowitz Supp. Decl. ¶ 27. This description fulfills the elements of the privilege by identifying the pages as (1) a confidential lawyer to agency-client communication and (2) regarding professional legal advice. These details are specific enough for the court to determine, on its own, that the elements of the privilege are fulfilled. However, USPS fails to offer a segregability analysis. USPS cannot withhold an entire document, *Vaughn I*, 484 F.2d at 825, without describing the mix of privileged and non-privileged information and explaining why it would not be possible to simply redact the privileged materials. *Mead Data Cent.*, 566 F.2d at 261.

The court must also deny summary judgment to both parties with regard to the other documents USPS attempts to privilege. *See* Benowitz Supp. Decl. ¶¶ 28, 30. USPS does little more than identify these documents as attorney-client communications without establishing that they involve the provision of legal advice. *See id.* USPS fails to show that these documents involved the provision of specifically *legal* advice or that they were intended to be confidential. *See id.* ¶¶ 28 (indicating that Pages 1187–91 "consist of draft talking points forwarded by a Postal Service official to the Postal Service General Counsel"), 30 (noting that Page 1591 "concerns issues raised by a union representing Postal Service employees"). These documents might well contain legal advice and confidential information, but USPS does not say so. As a result, the court cannot grant summary judgment in favor of either party with regard to these pages.

USPS's justifications for its redactions are similarly insufficient. *See id.* ¶ 34 (justifying individual redactions on Pages 191, 197, 200–05, 207–09). All the materials USPS redacted under the attorney-client privilege are contained in a "chronology that summarizes correspondence related to

maining seven pages were withheld under the attorney-client privilege in addition to the deliberative process or attorney work-

product privileges. *See id.* ¶¶ 27–28 (referring to withheld Pages 981–82, 1187–91).

the discovery of anthrax." *Id.* ¶ 34. All of these pages apparently involve communications to or from USPS attorneys regarding the discovery of anthrax in USPS locations in New York and matters of actual or potential litigation. *Id.* Though each redaction is mentioned by page number, USPS simply concludes that each redaction involves legal advice and relates to actual or potential litigation. *See id.* These descriptions are not detailed enough for the court to determine meaningfully, on its own, whether these documents are privileged. Without impugning USPS's honesty, the court is not allowed to grant summary judgment based on such conclusory statements. To do so would be tantamount to shirking the court's obligation to conduct a de novo review. *See Mead Data Cent.,* 566 F.2d at 251. As a result, with regard to these documents, the court must deny summary judgment to both USPS and Judicial Watch.

### 3. Attorney Work–Product Privilege

 USPS invokes the attorney work-product privilege in withholding five pages [12] (of 399 pages withheld in total) and in redacting six pages [13] (of 15 pages redacted in total). The attorney work-product privilege protects disclosure of materials prepared by attorneys, or non-attorneys supervised by attorneys, in contemplation of litigation, that reveal information about an attorney's preparation and strategy relating to a client's case. *See Coastal States,* 617 F.2d at 866. The privilege protects the adversary trial process by allowing attorneys to ˙ zealously pursue their clients' interests without worrying that the fruit of their efforts will be disclosed to an opposing party. *See id.* at 864. Factual work-product material is also protected unless the requesting party can show a substantial need for the material and an inability to obtain it without suffering undue hardship. *See* Fed.R.Civ.P. 26(b)(3); *Putnam v. U.S. Dep't of Justice,* 873 F.Supp. 705, 711 n. 4 (D.D.C.1995). The work-product privilege can be waived, however, if the work product is disclosed to a third party who does not share a "common interest in developing legal theories and analyses of documents" with the primary party. *In re Sealed Case,* 676 F.2d 793, 817 (D.C.Cir.1982) (quoting *United States v. AT & T Co.,* 642 F.2d 1285, 1300 (D.C.Cir.1980)); *see In re Lindsey,* 158 F.3d 1263, 1282 (D.C.Cir.1998). Thus, a disclosure to a third party that promotes the client's trial strategy and is consistent with maintaining secrecy against trial opponents does not waive the privilege. *See AT & T Co.,* 642 F.2d at 1299.

 The privilege is limited in scope. It only exempts those documents prepared in contemplation of litigation, not to "every written document generated by an attorney." *Senate of Puerto Rico,* 823 F.2d at 586. The D.C. Circuit has found that withheld "documents must at least have been prepared with a specific claim supported by concrete facts which would likely lead to litigation in mind." *Coastal States,* 617 F.2d at 865. An agency that fails to do so cannot invoke the privilege. *Id.* (denying

---

12. No pages were withheld solely under the attorney work-product privilege. Five pages were withheld under the attorney work-product privilege in addition to the attorney-client or deliberative process privileges. *See* Benowitz Supp. Decl. ¶¶ 29 (referring to withheld Pages 1192–94), 31 (Pages 1746–47).

13. One page was redacted solely under the attorney work-product privilege. *See* Benowitz Supp. Decl. ¶ 34 (referring to Page 206). Five more pages were redacted under the attorney work-product privilege in addition to the attorney-client or deliberative process privileges. *See id.* ¶ 34 (referring to redacted Pages 197, 200–03, 209).

agency's attorney work-product privilege claim when it "neglected to supply the court with sufficient facts, either in its index or its submitted affidavits, to permit a conclusion that in fact specific claims had arisen and were likely to be pursued to the point of litigation by the agency.").

██ USPS identifies three pages that come close to being privileged, but the court, deprived of certain details, cannot grant summary judgment in favor of either party. Pages 1192–94 consist of a memorandum of legal advice from a USPS attorney to the USPS General Counsel "prepared for the purpose of responding to actual or potential attempts by Postal Service employees to take legal action to close Postal Service facilities." Benowitz Supp. Decl. ¶ 29. These details are particular enough to indicate that "specific claims had arisen" (the USPS employee litigation) such that USPS would be forced to engage in litigation. *Coastal States,* 617 F.2d at 865. However, USPS provides no indication of whether the documents have been shared with third parties and, therefore, whether the privilege has been waived. *See In re Sealed Case,* 676 F.2d at 817. Specifically, if USPS attorneys prepared these documents to respond to litigation, and had filed substantially similar materials with a court such that they were publicly available, USPS would have waived the privilege. In a normal, adversarial contest in which parties are presumed to have roughly equal access to the facts, it would be Judicial Watch's burden to prove that USPS waived the privilege. However, in this FOIA case, USPS possesses almost exclusive access to the facts and, therefore, must show that it has not waived the privilege because Judicial Watch is not positioned to prove otherwise. *See King,* 830 F.2d at 218 (acknowledging imbalance in access to facts and requiring agency to "correct, however imperfectly,

the asymmetrical distribution of knowledge that characterizes FOIA litigation"). Finally, USPS has failed to provide a segregability analysis of these pages.

Other documents USPS identifies are not even "almost" privileged. USPS identifies Pages 1746–47 as a chronology of the discovery of anthrax prepared by a USPS attorney in New York "for the purpose of responding to actual or potential litigation arising from the discovery of anthrax in the mail." Benowitz Supp. Decl. ¶ 31. Unlike the documents involving USPS employee litigation, however, the description of these chronology documents do not identify a specific claim to which USPS is responding; it does not even suggest that the chronology was prepared for a specific litigation. *See id.* USPS does not indicate anything about the nature of the litigation for which these chronologies were prepared. Again, without information allowing for an independent determination that the chronology somehow related to the strategy of USPS attorneys regarding specific litigation, the court must deny summary judgment to both parties. Yet again, USPS fails to present a segregability analysis.

Finally, all redacted documents were all part of a "chronology" that summarizes correspondence related to the discovery of anthrax. *Id.* ¶ 34. Yet USPS identifies no specific litigations in justifying the redactions. *See id.* (indicating that redactions on Pages 197, 200–04, 206 involved "actual litigation" or "potential litigation" but identifying no specific claims for which these documents were prepared). Again, the court is unable to grant summary judgment in favor of either party with regard to the document redacted pursuant to the work-product doctrine.

### D. Resolution: Detailed *Vaughn* Index

██ The court has found that USPS's declaration is, with regard to every docu-

ment, insufficiently detailed to allow the court to reach a proper determination regarding the sufficiency of USPS's justifications for withholding or redacting documents. The court is now faced with a number of options. *See Spirko v. USPS,* 147 F.3d 992 (D.C.Cir.1998) (reviewing the different options available to district courts).

First, the court has the discretion to order the documents produced for an in camera inspection. *See id.* at 998. The court declines to do this for the 414 documents USPS has redacted or withheld. This refusal is proper even when such a task would merely *appear* to be too burdensome for the court. *King,* 830 F.2d at 225 (providing a court other options for obtaining more information about documents claimed under a FOIA exemption when an in camera inspection "appear[s] too burdensome"). Furthermore, the D.C. Circuit has made it clear that an in camera review is no substitute for the Government's obligation to provide detailed indexes and justifications. *Lykins v. U.S. Dep't of Justice,* 725 F.2d 1455, 1463 (D.C.Cir. 1984); *accord Spirko,* 147 F.3d at 997; *Quinon v. FBI,* 86 F.3d 1222, 1228 (D.C.Cir.1996); *Animal Legal Def. Fund,* 44 F.Supp.2d at 304.

Second, the court may allow plaintiff discovery. *See Spirko,* 147 F.3d at 997. Judicial Watch has not requested discovery, and the court declines to order it as this time. Judicial Watch has, instead, requested the immediate production of the documents. This the court also declines to do because the court's conclusion is that USPS's declaration is insufficient, not necessarily that disclosable documents have been withheld.

Third and finally, the court may remand back to the agency for further review and consideration. This option is the most appropriate at this point. *See Pollard v.* *FBI,* 705 F.2d 1151, 1154 (9th Cir.1983) ("If the government's initial attempts to provide justification for its claimed exemption fail to provide a sufficient basis for decision, the district court may require the government to submit more detailed public affidavits before resorting to *in camera* review of the documents themselves and/or *in camera* affidavits. By doing so, the district court will insure that the record made is 'as complete a public record as is possible . . . .'") (quoting *Phillippi v. CIA,* 546 F.2d 1009, 1013 (D.C.Cir.1976)). Accordingly, the court remands to USPS to review all previously withheld and redacted documents. USPS must disclose all documents, in full, that do not fall within the parameters of the three privileges, as defined above. After such review, with regard to documents USPS still identifies as privileged under Exception 5, USPS must submit to Judicial Watch and this court a detailed *Vaughn* Index.

It is said that *Mead Data Central* provides the best general advice on how much and what kind of detail the *Vaughn Index* should contain. *See Senate of Puerto Rico,* 823 F.2d at 587 ("Our decision in *Mead Data* remains perhaps the best general guide to both the details agencies must provide to support exemption (5) claims and, correlatively, the level of scrutiny appropriate in court evaluation of those claims."). General advice aside, the revised *Vaughn* index must be sufficiently detailed such that the court and Judicial Watch can conduct their own reviews of the applicability of the privileges to specific documents. The revised index should provide details on *each* document—for apparently USPS's category-by-category approach was not fruitful—such that the court could, on its own, match these details to each element of every privilege that applies to a particular document. Furthermore, the revised index must also pro-

vide information on any other potentially dispositive issues identified by the court (e.g., waiver of privilege because documents were adopted as final policy or because they were released to third parties).

Finally, for each and every document, the revised *Vaughn* Index must include a segregability analysis for every document withheld in full, identifying the proportion of privileged and non-privileged information, and must explain specifically why the documents can not be redacted and produced. Documents containing privileged information that USPS can reasonably segregate must be disclosed and redacted.

Understandably, producing a properly detailed *Vaughn* Index is a considerable burden for USPS. However, Congress, in enacting FOIA, has chosen to place this burden upon agencies, giving them a clear, if difficult, choice:

> Those burdens [of providing a sufficiently detailed *Vaughn* Index] may be avoided at the option of the agency ... by immediate disclosure. Congress has encouraged the agencies to disclosure exempt material for which there is no compelling reason for withholding, and an agency's own balancing of the resource costs of justifying nondisclosure against the value of secrecy may provide a rough estimate of how compelling is its reason for withholding.

*Mead Data Cent.,* 566 F.2d at 261. Whether or not further withholdings and redactions justify their cost is, of course, up to USPS. In any case, another insufficiently detailed index will simply not be acceptable. If USPS fails to file a sufficiently detailed index, the court will allow Judicial Watch to refile its motion for summary judgment or file any other motions (e.g., for in camera inspection or discovery) necessary to obtain USPS's compliance. *See Animal Legal Def. Fund,* 44 F.Supp.2d at 305.

## CONCLUSION

For the foregoing reasons, the court concludes that defendants' motion for summary judgment must be granted in part and denied in part and without prejudice, and it is further

**ORDERED** that Plaintiffs' cross-motion for summary judgment must be similarly denied, also without prejudice; and it is further

**ORDERED** and **ADJUDGED** that USPS has properly invoked Exemptions 2, 3, 6 and 7(c); and it is further

**ORDERED** that, by no later than March 1, 2004, USPS shall disclose any previously withheld document, or any portion thereof, that does not fall within the proper scope of the privileges under Exemption 5, as described above; and it is further

**ORDERED** that for all documents withheld or redacted, the USPS shall produce a comprehensive *Vaughn* index, describing each document withheld or redacted and explaining the reason for the agency's nondisclosure in terms of the elements of the privileges USPS intends to invoke; and it is further

**ORDERED** that for any document withheld or redacted entirely that USPS shall detail, in this index, the proportion of exempt and non-exempt materials, and explanations as to why the wholly withheld materials cannot simply be redacted; and it is further

**ORDERED** that this index and affidavit shall correlate claimed exemptions with particular passages within each document; and it is further

**ORDERED** that this index shall be filed by no later than March 19, 2004.