**JUDICIAL WATCH, INC., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.**

**No. CIV.A. 02–64(RMC).**

United States District Court, District of Columbia.

March 3, 2004.

Larry Klayman, Paul J. Orfanedes, James F. Peterson, Judicial Watch, Inc., Washington, DC, for Plaintiff.

Samuel C. Kaplan, U.S.Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Defendants.

## MEMORANDUM OPINION

COLLYER, District Judge.

The financial collapse of Enron Corp. ("Enron") caused immense public interest in the company and its former chairman, Kenneth Lay. Just three days after the December 2, 2001, filing of Enron's voluntary bankruptcy petition, Judicial Watch, Inc. ("Judicial Watch"), a public interest organization, submitted a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), to the Department of Justice ("DOJ"), the Federal Energy Regulatory Commission ("FERC"), and the Department of the Treasury ("Treasury") for records relating to Enron and Mr. Lay. These government agencies then searched their files and produced some documents, while withholding others in full or in part pursuant to various FOIA exemptions. Not satisfied with the level of disclosure, Judicial Watch filed suit on January 14, 2002. Currently before the Court are two motions for summary judgment, which Judicial Watch opposes in part.[1] For the following reasons, the Court will grant these motions in part and deny them in part.

### I. BACKGROUND

The facts are not disputed and are taken mainly from the defendants' thorough presentations. In its December 2001 FOIA request, Judicial Watch sought 19 different categories of records relating to Enron and Mr. Lay, including all documents that refer or relate to "[t]he bankruptcy of the Enron Corporation." Compl. Exh. 1. DOJ made an interim production of responsive non-exempt documents on March 14, 2002, and completed production

---

1. DOJ and FERC filed motions for summary judgment in February 2003, at which time Treasury filed a partial motion for summary judgment and suggested a briefing schedule for the remaining items. Treasury filed its motion for summary judgment as to the remaining documents in May 2003. Both motions have now been fully briefed and will be decided together.

on May 24, 2002. FERC made four rolling productions of documents on February 28, 2002, April 12, 2002, July 8, 2002, and February 14, 2003. Treasury—which received 15 similar requests for Enron-related materials—began its production of documents on February 19, 2002, and made 20 additional productions through January 15, 2003.[2] In addition, Treasury determined that certain documents it had collected originated with the Department of State ("State"), the Executive Office of the President ("EOP"), and the Office of the United States Trade Representative ("USTR"), among others. Such documents were referred back to the originating entities. Production of these documents, in full or in part, and withholding of some pursuant to FOIA exemptions, is now complete.

## A. DOJ

Judicial Watch's FOIA request to DOJ was sent to the Office of Information and Privacy ("OIP").[3] OIP determined that the Offices of the Attorney General, Deputy Attorney General, Associate Attorney General, and the Department Executive Secretariat were reasonably likely to have responsive records. Searches of those offices revealed 22 documents, totaling 90 pages. On March 14 and May 24, 2002, OIP released in whole 12 documents totaling 33 pages and released another five documents in part based on FOIA Exemptions 5 and 6. Three documents, totaling four pages, were withheld in full pursuant to Exemption 5. DOJ produced a *Vaughn* index of responsive, exempt documents on July 1, 2002.[4]

In addition, OIP referred one document to the Executive Office for United States Attorneys ("EOUSA") for processing and direct response and one document of 18 pages to the Criminal Division of DOJ. After initially informing Judicial Watch that it would release two pages in part, EOUSA later released the document referred to it in full. The Criminal Division released three of the 18 pages referred to it and referred the remaining 15 pages to the Internal Revenue Service ("IRS"). IRS withheld all 15 pages under Exemption 3.

## B. FERC

After some initial correspondence concerning Judicial Watch's request for a fee waiver for processing its request, which was granted in all material respects, FERC searched all of its offices in response to the initial 19 categories of requests and additional requests received from Judicial Watch on January 14, 2002.[5]

On February 28, 2002, in the first of its rolling responses to Judicial Watch, FERC released 72 documents together with an index. FERC further released 210 documents on April 12, 2002. Approximately two months later, on July 8, 2002, FERC released 47 documents in full and 36 in part. Like DOJ, FERC produced a *Vaughn* index on July 1. Finally, FERC sent complete copies of an additional nine documents, that had previously been withheld in whole or in part, on February 14, 2003. In the end, FERC withheld in full 59 documents. FOIA Exemptions 5 and 6

---

**2.** Because of the large number of FOIA requesters, Treasury did not tailor its responses but released everything to every requester.

**3.** Judicial Watch requested expedited processing. Although DOJ initially denied expedition, DOJ later granted this request "in light

of heightened intervening media interest given to Enron." Def.'s Mot. for Summ. J. at 3.

**4.** *See Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir. 1973).

**5.** Only Judicial Watch's first request in December 2001 is the subject of this litigation.

were cited as the basis for its withholdings and redactions.

### C. Treasury

Treasury received 15 requests for Enron-related documents, including the December 2001 request from Judicial Watch. Pursuant to regulation, it afforded all such requests priority treatment as required when it receives more than five requests for substantially the same documents. *See* 31 C.F.R. § 1.5(a)(4). All Treasury offices were required to search their files, to certify their completion of that search, and to provide responsive documents to the Counselor for the General Counsel. Technical help was provided to employees who were having difficulty searching electronic files. Treasury retrieved and searched records that had been sent to storage under normal retention procedures and also searched the closed electronic files of departed officials reasonably believed to have responsive documents. The Counselor for the General Counsel received approximately 13,000 pages in response to these instructions.

At this point, Treasury is no longer certain of the number of documents it has produced specifically in response to the December 2001 request from Judicial Watch. From February 19, 2002, to January 14, 2003, Treasury released 5,456 pages in full and 4,779 pages in part, and withheld 280 pages in full in response to all of the Enron-related FOIA requests it received. These documents were produced to all requesters, including Judicial Watch.

Additionally, Treasury discovered over 1,000 pages of documents that originated with other agencies and referred those documents back to the originating agencies. Seven of those agencies determined that documents referred to them contained exempt material: the Export–Import Bank ("Ex–Im Bank"), the Overseas Private Investment Corporation ("OPIC"), the Department of Labor ("DOL"), the Federal Reserve Bank ("Federal Reserve"), State, EOP, and the USTR. With respect to the document referred to Ex–Im Bank, Treasury was instructed to release three pages in full and, pursuant to FOIA Exemptions 4 and 5, redact two pages and withhold the remaining pages. OPIC determined that three documents referred to it should be withheld in full and two documents should withheld in part under Exemptions 4 and 5. A document referred to DOL was released in redacted form pursuant to Exemptions 5 and 7(a). Of the ten responsive documents referred to the Federal Reserve, five were redacted and one was withheld in full pursuant to Exemptions 4 and 5.

Treasury referred 94 documents to State, which released 22 documents in full, 48 documents in part, and withheld 19 documents in full based on Exemptions 1, 4, 5 and 6 of FOIA. State also returned two documents to Treasury, which released them in full, and referred three documents for inter-agency coordination. OPIC withheld several lines from one of the three documents pursuant to Exemption 4; the other two were produced directly to Judicial Watch by the Department of Commerce. In consultation with EOP, Treasury released 28 pages in full and withheld 50 pages in part pursuant to Exemptions 2, 4 and 5. USTR withheld eight of 11 referred documents under Exemption 5.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This procedural device is not a "disfavored legal shortcut" but a reasoned and careful way to resolve

cases fairly and expeditiously. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Laningham v. United States Navy,* 813 F.2d 1236, 1242–43 (D.C.Cir.1987).

■ In the context of FOIA, the government must demonstrate that it "conducted a search reasonably calculated to uncover all relevant documents" and that any withheld material falls within a statutory exemption. *Weisberg v. Dep't of Justice,* 705 F.2d 1344, 1351 (D.C.Cir.1983); *see also* 5 U.S.C. § 552(a)(4)(B); *Petroleum Info. Corp. v. Dep't of Interior,* 976 F.2d 1429 (D.C.Cir.1992). With respect to the latter showing, an "agency may meet this burden by submitting affidavits or declarations that describe the withheld material in reasonable detail and explain why it falls within the claimed FOIA exemptions." *Judicial Watch, Inc. v. United States Postal Service,* 297 F.Supp.2d 252, 256 (D.D.C.2004). "[D]isclosure, not secrecy, is the dominant objective of [FOIA, so its exemptions] are explicitly made exclusive ... and must be narrowly construed." *Dep't of the Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976).

## III. ANALYSIS

Unlike the typical FOIA lawsuit, Judicial Watch does not challenge the adequacy of the defendants' searches.[6] It argues only that the defendants "are improperly withholding many [documents]."[7] Pl.'s Opp. to 1st Mot. for Summ. J. at 2 ("Because a close examination of the Defendants' Vaughn Indexes demonstrates that their claims of exemption cannot withstand scrutiny, [Judicial Watch] respectfully submits that Defendants ... are not entitled to summary judgment as a matter of law. Rather, the responsive documents at issue must be turned over to [Judicial Watch] without further delay."). The Court will address these disputed withholdings in turn.

### A. Exemption 1

■ Exemption 1 of FOIA protects from disclosure records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]" 5 U.S.C. § 552(b)(1). In determining whether certain information should be withheld under this exemption, courts are "quite deferential" to the agency's classification decisions. *See Washington Post v. Dep't of Defense,* 766 F.Supp. 1, 6–7 (D.D.C.1991).

> [T]he court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency. Judges, moreover, lack the expertise necessary to second-guess

---

6. Regardless, the defendants submitted affidavits that support the reasonableness of their searches in sufficient detail. *See Oglesby v. Dep't of the Army,* 920 F.2d 57, 68 (D.C.Cir.1990).

7. Judicial Watch does not challenge any documents withheld pursuant to Exemption 6 of FOIA. *See id.* at 2 n. 1.

such agency opinions in the typical national security FOIA case.

*Halperin v. CIA,* 629 F.2d 144, 148 (D.C.Cir.1980) (footnote omitted).

Pursuant to Executive Order 12958, as amended, Treasury withheld material classified as confidential from 43 documents that it had previously referred to State.[8] Executive Order 12958, entitled "Classified National Security Information," provides that information may be classified if it concerns, among other things, "foreign government information" or "foreign relations or foreign activities of the United States, *including confidential sources[.]*" Executive Order 12958 § 1.4(b) and (d). "The unauthorized disclosure of 'foreign government information' is presumed to cause damage to the national security."[9] *Id.* § 1.1(c).

Judicial Watch makes two arguments in favor of disclosure of records withheld by Treasury/State under Exemption 1. Judicial Watch first asserts that Treasury "has failed to indicate whether responsive records were classified *after* it received Plaintiff's FOIA request" and whether any records were properly classified. Pl.'s Opp. to 2nd Mot. for Summ. J. at 6. Treasury's affidavit, however, makes clear that only two documents were classified after the date of Judicial Watch's FOIA request and that State followed proper procedures in classifying those documents. *See* Decl. of Bernard C. Dowling ¶¶ 17–19.

Next, Judicial Watch objects to the descriptions of two groups of documents. With respect to Document Nos. T108, T88, T87, T86, T103, T102, T89, T100, T91, T98, T106, and T100, Judicial Watch asserts that "[t]hese documents [are] all described simply as telegrams" between the U.S. Embassy in Santo Domingo, Dominican Republic, to and from State. Pl.'s Opp. to 2nd Mot. for Summ. J. at 7. According to Judicial Watch, "[a] date and a telegram number are the only additional information provided." *Id.* at 7–8. Judicial Watch argues that Document Nos. T9, T34 and T33, which consist of telegrams from the U.S. Consulate in Mumbai and New Delhi, India, to State, should be disclosed because the descriptions are conclusory and generalized.

This characterization of Treasury/State's position is simply too limited to be accurate. Through the affidavit of Bernard C. Dowling, Acting Director, Office of Information Resources Management Programs and Services at State, Treasury has provided extensive and detailed information to support the conclusion that these telegrams are exempt from disclosure under FOIA Exemption 1. *See* Decl. of Bernard C. Dowling at 23–25, 26–31, 36–37. As an example, Mr. Dowling states:

> Four of the telegrams, *Document Nos. T88, T86, T103, and T89,* contain information concerning the dispute given to the Embassy in Santo Domingo by Smith–Enron officials in the expectation that it would be treated confidentially. Matters discussed include comments by Smith–Enron officials concerning the role of the World Bank/IFC in mediating the dispute, the details of a preliminary Memorandum of Understanding (MOU) settling the dispute, and roles of

---

8. Executive Order 12958 was amended on March 28, 2003, by Executive Order 13292. *See* 68 Fed.Reg. 15315. Section numbers referenced in this decision are from Executive Order 12958, as amended.

9. The definition of "foreign government information" includes "information provided to the United States Government by a foreign government or governments, an international organization of governments, or any element thereof, with the expectation that the information, *the source of the information,* or both, are to be held in confidence[.]" Executive Order 12958 § 6.1(r).

the Dominican Republic officials involved. *Document No. T86* also reports the comments of a Dominican official concerning the dispute that were given to Embassy officials in the expectation that his comments would be treat confidentially. In addition, these four telegrams plus *Document No. T108* all report Embassy Santo Domingo's comments on the state of play in the dispute. These comments include the Embassy's views on the World Bank/IFC mediation effort, the preliminary MOU and the roles of the Dominican Republic officials involved. Finally, *Document Nos. T87 and T102* provide information given to Department of State officers concerning the World Bank/IFC mediation effort by IFC officials in the expectation that their views would be treated confidentially. Release of the information in all seven telegrams described in this paragraph could adversely affect the ·persons involved, inhibit the willingness of corporate and foreign government officials to discuss frankly with the U.S. Government officials matters affecting our national interests, and damage relations with the Dominican Republic. The information in all seven telegrams ... is currently and properly classified CONFIDENTIAL under Section 1.4(d) of E.O. 12958 and information in T86, T87 and T102 is additionally classified under Section 1.4(b) of E.O. 12958.

*Id.* at 23–24. Based on Mr. Dowling's affidavit, the Court concludes that the challenge by Judicial Watch to these documents is in error; the documents were properly withheld from disclosure under Exemption 1.

### B. Exemption 3

■ DOJ cites FOIA Exemption 3 as the basis for withholding 15 pages of documents that it referred to the IRS and ultimately refused to release to Judicial Watch. Exemption 3 permits an agency to withhold records "specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld[.]" 5 U.S.C. § 552(b)(3). The statute at issue here is § 6103 of the Internal Revenue Code. *See* 26 U.S.C. § 6103. "This court and others have recognized consistently that I.R.C. § 6103(a) is a nondisclosure statute falling within the scope of FOIA Exemption 3." *Tax Analysts v. IRS,* 214 F.3d 179, 182 (D.C.Cir.2000); *see also Church of Scientology of Calif. v. IRS,* 484 U.S. 9, 11, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987) ("[I]f § 6103 forbids the disclosure of material, it may not be produced in response to a request under the FOIA."). Section 6103(a) requires that "[r]eturns and return information shall be confidential" and generally cannot be disclosed. The term "return information" is defined broadly to include "data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to ... the existence, or possible existence, of liability (or amount thereof) of any person" under the Code. 26 U.S.C. § 6103(b)(2)(A).

Judicial Watch argues that "DOJ has failed to make the requisite nonconclusory and detailed showing with respect to the 15 pages of documents that it referred to the IRS ...." Pl.'s Opp. to 1st Mot. for Summ. J. at 6. It contends that the declaration of Gerald A. Richards is insufficient because "Mr. Richards only describes the documents as 'internal memoranda of the third-party corporate taxpayer.'" *Id.* (quoting Decl. of Gerald A. Richards ¶ 5). The plaintiff seriously understates Mr. Richards's affidavit and his explanation of the return data. In addition to describing

the documents as quoted by Judicial Watch, Mr. Richards adds:

> The subject matter addressed in the four documents concerned issues pertinent to the existence of income to the corporation and the disallowance of a deduction, and I examined these four internal memoranda in the course of my official duties in consideration of whether to open an examination to determine the existence, or possible existence, of liability of the third-party taxpayer under the Code.

Decl. of Gerald Richards ¶ 6. Mr. Richards's *entire* statement shows that these four documents were records "received by" the IRS in 1995 "with respect to the ... possible existence ... of liability" under the Internal Revenue Code. Based on this description, the Court concludes that these documents constitute "return information" and are exempt from disclosure under Exemption 3.

## C. Exemption 4

Judicial Watch asserts that Treasury and State have improperly withheld non-confidential commercial material pursuant to FOIA Exemption 4, which protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential[.]" 5 U.S.C. § 552(b)(4). "Information ... falls within the second prong of the exemption if it is shown to be (1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *Pub. Citizen Health Research Group v. FDA,* 704 F.2d 1280, 1290 (D.C.Cir.1983). Judicial Watch contests the government's position that the documents in question are confidential.

■ The confidentiality of a record may turn on whether the information was voluntarily submitted to the government or whether it was compelled. "[F]inancial or commercial information provided to the Government on a voluntary basis is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass Energy Project v. NRC,* 975 F.2d 871, 879 (D.C.Cir.1992). On the other hand, when the government requires production,

> commercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.

*Nat'l Parks & Conservation Ass'n v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974) (footnote omitted). The D.C. Circuit explained the reason for this distinction: "when information is obtained under duress, the Government's interest is in ensuring its continued reliability; when that information is volunteered, the Government's interest is in ensuring its continued availability." *Critical Mass,* 975 F.2d at 878.

■ Judicial Watch challenges Treasury's withholding of documents received from Enron concerning that company's involvement in power projects in India, Bangladesh, and the Dominican Republic, as well as documents referred to State relating to Enron's power projects in India, Mongolia, Vietnam, Qatar, and Turkey. Specifically, Judicial Watch contends that Treasury's "descriptions fail to provide any concrete evidence of specific harm to Enron that will occur if the records are disclosed and fail to show that disclosure would discourage Enron and other companies from providing such information in the future." Pl.'s Opp. to 1st Mot. for Summ. J. at 9; *see also* Pl.'s Opp. to 2nd Mot. for Summ. J. at 10 (same). This

argument, however, puts the cart before the horse because it assumes that Enron was obligated to furnish Treasury with these documents. Judicial Watch does not offer a reason to support its belief that the documents in question were not submitted voluntarily, in contrast to the affidavits of Thomas M. McGivern and Mr. Dowling.[10] *See* Decl. of Thomas M. McGivern ¶ 51 ("Enron *voluntarily* submitted to Treasury information regarding its private dealings with a number of foreign governments, with foreign power projects in which it had an interest or investment, and with financial market studies being conducted by Treasury.") (emphasis added); Decl. of Bernard C. Dowling at 22–23, 28–29, 30–32, 36, 43–44, 49–50, 55–56, 59, 69–72, 74–75, and ¶ 24. Therefore, the Court defers to the only evidence—or argument—before it on this issue and concludes that Enron voluntarily supplied these documents to Treasury. *See generally Ground Saucer Watch, Inc. v. CIA,* 692 F.2d 770, 771 (D.C.Cir.1981) ("Agency affidavits enjoy a presumption of good faith . . . .").

Treasury's stated justification for withholding material concerning Enron's involvement in these overseas power projects easily fulfills the standard set forth by the D.C. Circuit in *Critical Mass* for documents produced voluntarily to the government. Mr. McGivern's affidavit attests that "the information withheld was provided with an expectation that it would be kept confidential and is information that Enron does not disclose publicly." Decl. of Thomas M. McGivern ¶ 52. Further, Mr. McGivern's description of three documents cited by Judicial Watch reveals that they contain material that would not ordinarily be divulged to the general public. Document No. 005000000001868–70 includes "detailed financial and commercial information describing Enron's investment in the Dabhol Power Company in India, including construction costs and expected profits[,]" and Mr. McGivern stated that the "confidential commercial and financial information . . . was submitted voluntarily with an expectation of privacy, was information that Enron does not disclose publicly and was necessary for Treasury's determination regarding whether to raise the matter with officials of the government of India." *Id.* Document No. 00500000000981–91 discusses "commercial and financial projections" of a proposed emergency power plant that Enron was attempting to build in Bangladesh. *Id.* Finally, Document No. 005000000001151–53 relates to Smith Enron's Dominican Republic power project and the backing of that project by the International Finance Corporation. Smith Enron "revealed confidential commercial and financial information to detail some of the problems encountered with the Dominican government." *Id.*

The material withheld by State pursuant to Exemption 4 includes "(1) internal financial information concerning foreign companies and power projects, including amounts owed by foreign governments to those projects . . . (2) company business plans, including proposed pricing and production information . . . (3) the views of Enron officials on disputes with foreign governments . . . (4) the impact of the economic policies of foreign governments

---

**10.** Judicial Watch only makes a general statement that "the class of information that a submitter is 'obligated to furnish the Government' is construed broadly to include information that must be submitted as a condition to the person's participation in voluntary activity with the government." *Id.* at 7–8. However, Judicial Watch does not attempt to show how this statement applies to these particular Enron documents. "It points to no legal authority that compelled Enron to submit these documents, or that authorized the government to compel their submission." Defs.' Reply for 1st Mot. for Summ. J. at 14.

... and (5) Enron's negotiations with foreign governments[.]" Defs.' 2nd Mot. for Summ. J. at 13 (citations omitted). Treasury supports each of these statements with reference to Mr. Dowling's affidavit. Judicial Watch asserts that the descriptions of Document Nos. T9, T165, T10, and T33, which relate to Enron's investment in the Dabhol Power Company in India, are inadequate However, as Mr. Dowling attests:

> Enron representatives voluntarily provided the information to officers of the U.S. Consulate General in Mumbai and, in the case of *Document No. T33,* to officers of the U.S. Embassy in New Delhi. The six telegrams all contain proprietary commercial and/or financial information, which is of a type that is not customarily released to the public.

Decl. of Bernard C. Dowling at 36. The Court finds that Mr. Dowling's affidavit properly supports withholding these documents under Exemption 4.

### D. Exemption 5

FOIA does not apply to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Exemption 5 incorporates "all civil discovery rules . . . ." *Martin v. Office of Special Counsel,* 819 F.2d 1181, 1185 (D.C.Cir. 1987); *see also NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 148, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) ("[I]t is reasonable to construe Exemption 5 to exempt those documents, and only those documents, normally privileged in the civil discovery context."). In this case, the defendants have withheld documents under the deliberative process and attorney-client privileges, which have been recognized to fall within Exemption 5. *See Formaldehyde Inst. v. Dep't Health and Human Services,* 889 F.2d 1118, 1121 (D.C.Cir.1989) ("Courts have construed this exemption to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context, including materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive deliberative process privilege.") (internal quotation marks omitted).

### 1. Deliberative Process Privilege

■ The deliberative process privilege " 'protects the decisionmaking processes of government agencies' and 'encourages the frank discussion of legal and policy issues' by ensuring that agencies are not 'forced to operate in a fishbowl.' " *Mapother v. Dep't of Justice,* 3 F.3d 1533, 1537 (D.C.Cir.1993) (quoting *Wolfe v. Dep't of Health and Human Servs.,* 839 F.2d 768, 773 (D.C.Cir.1988)). To qualify for withholding, material must be both predecisional and deliberative.

> A document is predecisional if it was prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made. Material is deliberative if it reflects the give-and-take of the consultative process. [The D.C. Circuit's] recent decisions on the deliberativeness inquiry have focused on whether disclosure of the requested material would tend to discourage candid discussion within an agency.

*Petroleum Info. Corp. v. Dep't of Interior,* 976 F.2d 1429, 1434 (D.C.Cir.1992) (citations and internal quotation marks omitted). This exemption "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980).

### a. DOJ

■ Citing the deliberative process privilege, DOJ redacted handwritten notes from an invitation from Mr. Lay to Attorney General John Ashcroft inviting the Attorney General to address the Business Council at Enron's winter meeting in February 2001. Judicial Watch takes issue with the sufficiency of DOJ's affidavit, arguing that "[t]he only description given of the redacted portions of the document are that they consist of 'handwritten notes.'" Pl.'s Opp. to 1st Mot. for Summ. J. at 15. To the contrary, the affidavit explains that "[d]isclosure of the handwritten notes on this document would reveal what the staff member who wrote the notes considered to be important in this case [of Enron] and how the decision to attend the event may have been reached." Decl. of Melanie Ann Pustay ¶ 14.

The decision of which invitations to accept, of the many received by the Attorney General, would normally require staff opinions that must be candid to be useful. It is obvious, given the Attorney General's role as the chief law enforcement officer of the federal government, that there would be either legal or policy (or both) issues associated with an invitation from a large company in the energy industry, such as Enron. The Court finds that DOJ has adequately explained that the handwritten notes were withheld as predecisional advice to the Attorney General and are exempt from disclosure under Exemption 5.

### b. Treasury

Judicial Watch challenges four groups of documents withheld in full or in part by Treasury pursuant to the deliberative process privilege. First, Judicial Watch objects to redactions in Document Nos. 0010000000019 and 20, which consist of an email dated December 11, 2001, from Jim Langdon of the law firm Akin Gump to Robb LaKritz of Treasury and a subsequent exchange(s) between Treasury officials.[11] According to Judicial Watch, the description of these documents is vague and conclusory, fails to indicate what decision or role these documents played in the decision-making process, and fails to establish that disclosure would harm "the process by which *policy* is formulated." *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C.Cir.1992) (emphasis in original). The Court disagrees. Treasury's affidavit attests that it "redacted material that contains an internal discussion regarding what position to take at a meeting with Langdon with respect to the impact of credit rating agencies on the energy sector and opinions as to which Treasury employee should attend the meeting." Decl. of Thomas M. McGivern ¶ 33. In addition, Treasury's disclosure of the entire original email between Mr. Langdon and Mr. LaKritz provides a context for the redactions and suggests the subject matter of the subsequent internal discussions. The Court therefore concludes that these email exchanges contain predecisional discussions of what policy Treasury should follow and are properly exempt.

Judicial Watch next attacks Treasury's description of a redaction from Document No. 0010000000730, which is an "October 29, 2001 email from Michael Dawson to Tim Adams re: Pippa" that apparently discussed "the status of various ongoing policy issues." *Id.* Exh. H. Assuming that "Pippa" is a person and not a project, this generic reference to "various ongoing policy issues" fails to give the Court adequate information to determine whether this redaction is legitimate. The description does

---

11. These documents are essentially identical, except that Document 0010000000020 contains one more email in the chain.

not convey whether the policies in question have already been made, much less what types of policies were involved.

In contrast, Treasury's description of Document No. 00200000000257–258 is quite sufficient for the conclusion that material in this email and attachment is exempt from disclosure. Treasury states that this document "contains opinions on policy implications with respect to Enron collapse and draft recommendations for further discussion and analysis concerning priorities and the way to structure research, on evaluating impact and implications of Enron for purposes of developing policy on issue prepared for General Counsel and Under Secretary in advance of meeting with both and others on issue." Decl. of Thomas M. McGivern Exh. H. Judicial Watch unfairly criticizes this description as "rambling as well as vague[.]" Pl.'s Opp. to 1st Mot. for Summ. J. at 14. There is no doubt that the collapse of Enron caused enormous waves throughout the U.S. economy and international business. The description of this document indicates that the writers were developing "recommendations for further discussion and analysis concerning priorities" to deal with the situation. This is sufficient to demonstrate that the document includes pre-decisional opinion on a policy matter that is shielded from disclosure under FOIA.

Finally, Judicial Watch argues that Treasury has failed to substantiate a reason to withhold material from Document Nos. 00500000000101–103, 265–266, 267–268, 269–270, 279–280, 2080, 2329–30, and 01000000001057–59. These documents constitute a "December 3–4, 2001 email exchange between Geetha Rao, Bonnie Resnick, and Gary Sills as well as Greg Christopoulos and Larry McDonald re: Dam trip to India." Decl. of Thomas M. McGivern Exh. H. Treasury states that it redacted material containing "policy discussion of Enron project in India and impact of Enron bankruptcy on project, as well as contents of briefing material for Deputy Secretary, in advance of Deputy Secretary's trip to India." *Id.* This description suffices to demonstrate the subject matter of the documents (Enron's bankruptcy, its construction project in India, and material for the Deputy Secretary to brief him for a trip to India). These internal predecisional exchanges—from which the Deputy Secretary would determine how to communicate Treasury policy to India—are quintessential information protected by Exemption 5.

### c. FERC

FERC refused to disclose a January 16, 2002 email (Document No. 190) on the grounds that it "reflects internal agency deliberations related to preparation of Chairman for congressional testimony, including preliminary suggestions of Chairman and other FERC officials as to potential issues to be addressed in the testimony and relative importance of particular issues related to Enron." Decl. of Kevin F. Cadden Exh. G. Judicial Watch asserts that the description fails to specify what policy is being discussed, fails to specify where in the development of policy this email played a role, and fails to establish that disclosure would harm the process of policy formulation. *See* Pl.'s Opp. to 1st Mot. for Summ. J. at 16.

The Court finds that FERC's description of this document is sufficient. Testimony before Congress is a critical aspect of the duties of an agency head. Such testimony allows congressional—*i.e.,* public—oversight of the Executive Branch. Especially in the fluid context of an ongoing investigation, where multiple federal departments and agencies have policy and enforcement interests and the rights of those under the microscope must also be protected, congressional testimony must be carefully considered and developed.

The *Vaughn* index describes Document No. 190 as a predecisional discussion of various issues that might be addressed by FERC's chairman in his testimony and the "'relative importance'" of those issues. The email is exactly the kind of internal predecisional discussion that, if revealed, might confuse the public as to the bases for the chairman's later testimony. *See Judicial Watch, Inc. v. Clinton*, 880 F.Supp. 1, 13 (D.D.C.1995) ("[D]isclosure [of draft memoranda to agency ethics officers] would impede agency decision-making and create public confusion regarding the agency's rationale."). FERC's chairman is entitled to have a full and frank discussion with his staff concerning issues, priorities, and policy matters about which he is about to give public testimony. Accordingly, FERC's withholding of this document under Exemption 5 was appropriate.

Judicial Watch also contests FERC's decision not to produce Document No. 504, a "draft notational order concerning future role of Enron in New England Power Pool." Decl. of Kevin F. Cadden Exh. G. Judicial Watch asserts that this description fails to specify what policy is under discussion in the document. The Court cannot agree. Document No. 504 is aptly described as a draft FERC order that would govern Enron's participation, if any, in the collective pooling of power resources to provide electric power to New England. As a draft order, which may or may not have ever seen the light of day, this document is a predecisional reflection of the potential exercise of policy-oriented judgment.

#### d. Treasury/EOP

Judicial Watch complains that EOP, through Treasury, has improperly withheld material from Document No. 00300000000127–153 without sufficiently explaining why the claimed deliberative process privilege should apply to this information. Pl.'s Opp. to 2nd Mot. for Summ. J. at 14–15. This record is an "inter-agency memorandum on the subject of Electricity Industry Restructuring." 3rd Decl. of Thomas M. McGivern ¶ 4. Judicial Watch asserts that the proffered description is "vague and conclusory," fails to indicate "what decision or what role, if any, these records or the information contained therein played in the decision making process," and does not establish how the document's full disclosure would harm the policy process. Pl.'s Opp. to 2nd Mot. for Summ. J. at 15.

Mr. McGivern, however, addresses these issues:

> The memorandum contains the [inter-agency] working group's opinion and analysis of electricity industry restructuring and its ideas on how to proceed with restructuring .... The group suggested a number of options on key issues and discussed the pros and cons of each option .... This energy policy group produced advice to the White House on national policy for the electricity markets.

3rd Decl. of Thomas M. McGivern ¶ 4. Further, he notes that the document is marked "For Internal Use Only—Contains Market Sensitive Information." Judicial Watch's objection to this description is without merit and the Court sustains Treasury/EOP's redactions with respect to this document.

#### e. Treasury/USTR

On referral from Treasury, USTR determined that three documents should be released in full and eight should be withheld. Decl. of Sybia Harrison ¶ 3. Judicial Watch challenges seven of the eight withheld documents.[12] It asserts that the descriptions

12. Document Nos. 00500000002437–2449 ("USTR Options Paper on Welded Line Pipe

are vague and conclusory, that there is no information on what role these records played in the decision-making process, and that Treasury/USTR failed to establish that disclosure would harm the policy process. *See* Pl.'s Opp. to Mot. for Summ. J. at 15 ("No further description is provided other than that these records 'are an internal USTR issue paper and drafts of that paper addressing the impact of a decision of the United States International Trade Commission ('ITC') concerning the trade effect of welded line pipe imports.' ").

Treasury/USTR has submitted detailed information to demonstrate the applicability of the deliberative process privilege. In addition to the description quoted above, Sybia Harrison, USTR FOIA officer, avers that these documents

> provide analysis, commentary and, in some cases, recommendations that are predecisional to a potential USTR recommendation in response to the ITC decision .... Moreover, because these documents were prepared by a USTR attorney in a matter that was anticipated to become a dispute before the World Trade Organization, as indeed occurred, these documents are covered by the attorney work-product doctrine.

Decl. of Sybia Harrison ¶ 5. The Court accepts Ms. Harrison's factual description and agrees with her legal conclusion. The redacted material is not subject to FOIA disclosure; it is privileged and therefore protected by Exemption 5.

## 2. Attorney–Client Privilege

█ The attorney-client privilege protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Central, Inc. v. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C.Cir.1977). "Uninhibited confidence in the inviolability of the relationship is viewed as essential to the protection of a client's legal rights, and to the proper functioning of the adversary process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C.Cir.1980). This privilege "extends to all situations in which an attorney's counsel is sought on a legal matter"; however, it is "limited to those situations in which its purposes will be served." *Id.*

### a. Treasury [13]

█ Treasury describes Document No. 01000000000625–26 as "a July 1994 memorandum for the Treasury General Counsel from the Deputy General Counsel and Designated Ethics Official containing legal advice concerning a prospective letter by the Secretary of the Treasury concerning Enron Corp." Decl. of Thomas M. McGivern ¶ 50. Judicial Watch contends that "this record primarily concerns advice given by attorneys rather than facts communicated by clients." Pl.'s Opp. to 1st Mot. for Summ. J. at 18–19. This argument misconstrues the scope of the privilege. "While its purpose is to protect a

---

Safeguards Case"); 00500000002423–2435 ("Welded Line Pipe Safeguards Case"); 00500000002409–2422 ("Welded Line Pipe Safeguards Case"); 00500000002370–2380 ("2/2DRAFT: Welded Line Pipe Safeguards Case"); 00500000002381–2387 ("Treasury Staff Comments 2/4 (Changes in bold underline): 2/2DRAFT Welded Line Safeguards Case"); 00500000002334–2344 ("Issue Paper discussing the ITC vote finding import injur[y] from welded line pipe imports"); and 00500000002388–2400 ("Draft with com-

ments on Issue paper discussing the ITC vote finding import injury from welded line pipe imports"). *See* Decl. of Sybia Harrison ¶ 3; Pl.'s Opp. to 2nd Mot. for Summ. J. at 15, 16 n. 2.

**13.** For documents allegedly protected by attorney-client privilege, Treasury asserts that the deliberative process privilege also applies to support non-disclosure. *See* Defs.' Reply for 1st Mot. for Summ. J. at 19.

client's disclosures to an attorney, the federal courts extend the privilege also to an attorney's written communications to a client, to ensure against inadvertent disclosure, either directly or by implication, of information which the client has previously confided to the attorney's trust." *Coastal States*, 617 F.2d at 862. The document in question is a staff memorandum to the General Counsel to assist him in providing legal advice to the Secretary of the Treasury. In this instance, the Secretary—as head of the agency—is the "client" and the communication is therefore privileged and exempt from disclosure. "Like the deliberative process, the attorney-client privilege helps improve the quality of agency decision making by safeguarding the free flow of information that is a necessary predicate for sound advice." *Murphy v. Tenn. Valley Auth.*, 571 F.Supp. 502, 506 (D.D.C.1983).

Judicial Watch next argues for disclosure of Document No. 01000000000802–03, which consists of a series of "e-mail exchanges between the Deputy Assistant General Counsel for General Law and Ethics, the Acting General Counsel, the Assistant General Counsel for General Law and Ethics, an Attorney–Advisor, and the Treasury Chief of Staff regarding the confidential communication of a Treasury official seeking legal advice from the General Counsel's office in its capacity as legal advisor concerning personal financial information as it related to his official duties." Decl. of Thomas M. McGivern ¶ 50. Judicial Watch objects that this document "primarily concerns advice given by attorneys rather than facts communicated by the client in confidence." There is no legitimate argument that these emails are not privileged, if not as attorney-client communications (based on information provided by the Treasury official seeking legal ad-

vice) then pursuant to the deliberative process privilege, both of which Treasury cites for withholding.

Lastly, Treasury has withheld "weekly office reports for the weeks ending June 22, 2001, July 27, 2001, and December 14, 2001" (Documents No. 0100000001035–1049). *Id.* These memoranda involve "various discrete entries referring to various ongoing projects and issues involving Treasury[.]" *Id.* Judicial Watch asserts that "[t]here is no indication that these documents contain any facts communicated by clients or advice based on those facts." Pl.'s Opp. to 1st Mot. for Summ. J. at 19. Mr. McGivern, however, plainly states in his affidavit:

> [These documents] in many cases reflect confidential communications made by Treasury personnel for the purpose of seeking legal advice on matters relating to official duties .... The discrete sections regarding Enron in the June and July memoranda reflect the opinion of the office of the Assistant General Counsel for International Affairs on issues related to Enron's dispute with the Government of India and the contract with Azurix Corp. with the government of Buenos Aires.

*Id.* Judicial Watch also contends that "there is no indication that these reports are kept within the [Treasury] General Counsel's Office and not circulated to other portions of [the agency.]" Decl. of Thomas. M. McGivern ¶ 50. Mr. McGivern resolves this issue by explaining, "These memoranda are confidential and not distributed outside of the Treasury Legal Division ...." *Id.*

#### b. FERC [14]

FERC refuses to release Document Nos. 568E and 580 on the grounds that

14. FERC also argues that these documents would be properly withheld pursuant to the deliberative process privilege. *See* Defs.' Reply for 1st Mot. for Summ. J. at 11.

they "contain a confidential communication from the Solicitor in the General Counsel's office to FERC's General Counsel seeking legal advice on a matter related to the Enron bankruptcy, and the legal advice provided by the General Counsel in response." Decl. of Kevin F. Cadden ¶ 16. Judicial Watch argues that "[t]his description indicates no communication from a client, rather it is a lawyer to lawyer communication." Pl.'s Opp. to 1st Mot. for Summ. J. at 20. "In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C.Cir.1997). Just as a lawyer representing a corporation responds to corporate/client questions posed by individuals within the corporation, so too does the FERC General Counsel represent the agency by providing legal advice to FERC employees, including other attorneys. The description of Document Nos. 568E and 580 demonstrates just such a request for legal advice and a response, and is shielded from disclosure.

 FERC Document No. 591, however, remains something of a mystery. It is said to contain "a confidential communication from an agency staffer to the General Counsel concerning a visit from an Enron official." Decl. of Kevin F. Cadden ¶ 16. Despite the broad responsibilities of the FERC General Counsel for all agency legal matters, this description fails to identify any legal issue or even that legal advice was sought.[15] A communication is not privileged merely because it involves a lawyer. Without more to justify withholding, this document must be released.

### E. Exemption 7

 Exemption 7 of FOIA allows a federal agency to withhold records that are compiled for law enforcement pur-

poses, if their production "could reasonably be expected to interfere with enforcement proceedings[.]" 5 U.S.C. § 552(b)(7)(A). "To establish a law enforcement purpose, [the] declarations must establish (1) 'a rational nexus between the investigation and one of the agency's law enforcement duties;' and (2) 'a connection between an individual or incident and a possible security risk or violation of federal law.'" *Center for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 926 (D.C.Cir.2003) (quoting *Campbell v. Dep't of Justice*, 164 F.3d 20, 32 (D.C.Cir.1998)). An "enforcement proceeding" need not be presently pending, so long as it is likely to occur. *See id.*

 Treasury withheld material from two records (Document Nos. 00200000000012 and 00200000000016–17, along with copies of these documents) that relate to an ongoing investigation of Enron by the Securities and Exchange Commission ("SEC"). Judicial Watch argues that the description proffered by Treasury does not indicate how the documents fit within Exemption 7, except for general and conclusory statements. Pl.'s Opp. to 1st Mot. for Summ. J. at 22. However, in a supplemental affidavit, Mr. McGivern states that "[t]he documents describe the status of the investigation, the SEC's 'main concern,' the material the SEC had thus far collected, its assessment of that information, and the information that it still required." Suppl. Decl. of Thomas M. McGivern ¶ 2; *see Swan v. SEC*, 96 F.3d 498, 500 (D.C.Cir.1996) (finding documents exempt under 7(A) where disclosure "could reveal much about the focus and scope of the Commission's investigation"). Revelation of such information during the course of the SEC's investigation of Enron could damage that agency's ability to obtain all

---

**15.** The description fails as well to provide sufficient information from which a requester or the Court might conclude that it is covered by the deliberative process privilege.

relevant information and could reveal premature and/or unfounded questions that full investigation might resolve. Accordingly, Treasury's redactions in two documents under Exemption 7 were proper.

## IV. CONCLUSION

For the reasons stated above, the Court will grant the defendants' summary judgment motions in part and deny them in part. The motions will be granted as to all challenges except for two documents for which the government's descriptions are insufficient. The motions will be denied as to Treasury Document No. 0010000000730 and FERC Document No. 591, which must be produced in full. A separate order accompanies this memorandum opinion.